104 P.3d 336

Anatalia CENAL and Michael CENAL,
Plaintiffs–Appellants,

v.

Luis RAGUNTON, M.D.,
Defendant–Appellee,

and

Doe Defendants 1–100, Defendants.

No. 25761.

Intermediate Court of Appeals of Hawai'i.

Dec. 27, 2004.

Paul V. Smith and Charles J. Ferrera, Honolulu, on the briefs, for plaintiffs-appellants.

John S. Nishimoto and Michael J. Van Dyke (Ayabe, Chong, Nishimoto, Sia & Nakamura), Honolulu, on the briefs, for defendant-appellee Luis Ragunton, M.D.

LIM, Acting C.J., FOLEY and FUJISE, JJ.

Opinion of the Court by FOLEY, J.

Plaintiffs–Appellants Anatalia Cenal (Anatalia) and Michael Cenal (Michael) (collectively, the Cenals) appeal from the Judgment

filed on February 3, 2003 in the Circuit Court of the First Circuit (circuit court).[1]

On appeal, the Cenals contend (1) the jury verdict was against the clear weight of the evidence and/or the jury misunderstood its charge; (2) the circuit court erred in not granting the Cenals' Motion for New Trial; (3) the circuit court erred when it did not permit the Cenals to ask prospective jurors if the jurors had any interest or relationship to Defendant–Appellee Luis Ragunton, M.D.'s (Dr. Ragunton) insurance company; and (4) the circuit court erred when it did not allow the Cenals to cross-examine George Druger, M.D. (Dr. Druger), Dr. Ragunton's witness, about his prior financial relationships with Dr. Ragunton's insurance company. We affirm.

### I.

In January 1987, Anatalia was referred to Dr. Ragunton for treatment of hypertension by George Chu, M.D. (Dr. Chu). At the time, both Dr. Chu and Dr. Ragunton were working at Fronk Clinic. Dr. Ragunton diagnosed Anatalia with allergic rhinitis[2] and hypertension. Around 1990–1991, Dr. Ragunton left Fronk Clinic for private practice and took Anatalia with him as a patient for treatment of her hypertension and respiratory problems.

On April 12, 1993, Anatalia came to Dr. Ragunton with a sudden acute exacerbation of her asthma, which he assessed as being from an infection. Dr. Ragunton initially treated her with medications for the infection and systemic steroids. Anatalia came back on April 16, 1993 with complaints of continued symptoms, and Dr. Ragunton added a steroid inhaler. Anatalia got better with Dr. Ragunton's treatment for the infection.

Anatalia saw Dr. Ragunton in February and July 1994; January, March, April, and November 1995; July and November 1996; January and May 1997; April, May, and October 1998; and June 1999 for exacerbations of her asthma. Anatalia was also

---

1. The Honorable Victoria S. Marks presided.

2. Allergic rhinitis is "a general term used to denote any allergic reaction of the nasal mucosa;

it may occur perennially ... or seasonally." *The Sloane–Dorland Annotated Medical–Legal Dictionary* 620 (1987).

hospitalized four times for status asthmaticus. Status asthmaticus is a severe, potentially life-threatening asthma attack. While hospitalized, Anatalia received high dose I.V. steroids as treatment.

On July 2, 1998, Anatalia went to Dr. Ragunton with a complaint of severe left hip pain. An x-ray of her left hip showed abnormalities to her femoral head (a ball at the top of the thigh bone that fits into the hip socket). Dr. Ragunton ordered an MRI of the hip because the x-ray was abnormal. The MRI came back positive for avascular necrosis.[3] As a result, Anatalia had her left hip replaced in November 1998.

On December 8, 2000, the Cenals filed a complaint against Dr. Ragunton for negligence and lack of informed consent based on the medical treatment received by Anatalia from Dr. Ragunton and for Michael's loss of consortium. On December 27, 2000, Dr. Ragunton filed an answer denying negligence and lack of informed consent and asserting defenses of failure to state a claim, contributory negligence, assumption of risk, statute of limitations, failure to mitigate damages, lack of proximate and/or legal cause, and the doctrines of estoppel, waiver and laches. Dr. Ragunton also demanded a trial by jury.

On November 27, 2002, prior to trial, Dr. Ragunton filed his "Motion in Limine # 5 to Preclude Evidence of and/or Reference to Professional Liability Insurance" (Motion in Limine). Dr. Ragunton argued that evidence of and reference to his professional liability and/or medical malpractice insurance should be excluded pursuant to Hawai'i Rules of Evidence (HRE) Rules 411 and 403. Specifically, Dr. Ragunton argued the Cenals should be precluded from asking the jurors about relationships and/or interests the jurors might have in Dr. Ragunton's liability insurance company, Medical Insurance Exchange of California (MIEC); from referencing or commenting on Dr. Ragunton's liability insurance coverage; and from questioning expert witnesses as to the existence and/or identity of their liability insurance carrier.

On November 29, 2002, the Cenals filed their "Memorandum in Opposition to Defendant Luis Ragunton, M.D.'s Motion in Limine No. 5 to Preclude Evidence of and/or Reference to Professional Liability Insurance Filed November 2[7], 2002." The Cenals argued that, to effectively exercise their right to a peremptory challenge, they were entitled to question each juror on voir dire about the juror's relationship to any insurance carrier. The Cenals also argued they were entitled to cross-examine Dr. Druger on the fact that MIEC had retained, hired, and paid Dr. Druger on multiple occasions because his repeatedly testifying for MIEC was relevant to his bias, interest, or motive in testifying.

At the December 4, 2002 hearing on the Motion in Limine, the Cenals requested permission to submit additional authority supporting their argument that they had a right to ask the jury whether any juror had a financial interest or stake in MIEC or any insurance carrier. The circuit court orally granted the Motion in Limine, but also granted the Cenals permission to submit additional case authority for the court's consideration.

On December 6, 2002, the Cenals filed their "Supplemental Memorandum in Opposition to Defendant Luis Ragunton, M.D.'s Motion in Limine No. 5 to Preclude Evidence of and/or Reference to Professional Liability Insurance Filed November 2[7], 2002," in which they submitted to the circuit court additional case authority regarding voir dire.

On January 22, 2003, the circuit court issued its "Order Granting Defendant Luis Ragunton, M.D.'s Motion in Limine # 5 to Preclude Evidence of and/or Reference to Professional Liability Insurance" (Order Granting Motion in Limine).

Jury trial commenced on December 10, 2002. At trial, the Cenals presented their theory of the case that Dr. Ragunton unnecessarily administered to Anatalia "powerful dangerous systemic steroids" because Dr. Ragunton "failed to diagnose her as having

---

**3.** Avascular necrosis "is a condition of bone deterioration or bone death resulting from the disruption of the blood supply to certain areas of the skeletal system.... *Johns Hopkins Hosp. v.*

*Lehninger,* 48 Md.App. 549, 429 A.2d 538, 541 (1981)." *The Sloane–Dorland Annotated Medical–Legal Dictionary* 476 (1987).

allergic asthma." The Cenals proposed that Dr. Ragunton "used a treatment regime that was completely inappropriate and that caused [Anatalia] to experience a condition called avascular necrosis, where the bone in her hip died and crumbled, had to be removed and replaced[.]"

Dr. Ragunton presented his theory that Anatalia's asthma exacerbations were brought on by recurrent infections. He posited that he "acted well within reason in attempting to deal with [Anatalia's] sudden exacerbations" by giving her oral or injectable steroids. Dr. Ragunton submitted that the evidence would "show that his use of steroid medications will not have been proven to have caused the avascular necrosis in the hip that [Anatalia] sustained," and that "the amounts of steroids that have just been associated, not shown to cause it, just been associated with the development of this condition is so far in excess of what [Anatalia] received through her asthma treatments."

On December 19, 2002, the jury reached its verdict. On the Special Verdict form, as to Question No. 1: "Was Dr. Luis Ragunton, M.D. negligent in his care and treatment of Anatalia Cenal?", the jury marked 1 for "Yes" and 10 for "No." [4] As to Question No. 3: "Did Dr. Ragunton fail to obtain Plaintiff Anatalia Cenal's informed consent to the treatment he proposed?", the jury marked 2 for "Yes" and 10 for "No." [5] On February 3, 2003, the circuit court filed the Judgment in favor of Dr. Ragunton.

On February 11, 2003, the Cenals filed a Motion for New Trial. The Cenals argued they were entitled to a new trial because "the jury's finding of no negligence on question no. 1 of the special verdict form was clearly against the manifest weight of the evidence, and in contradiction to the law as set-forth [sic] in the jury instruction" on admissions.

Dr. Ragunton filed his Opposition to Plaintiffs' Motion for New Trial on February 24, 2003. He argued the circuit court should deny the Motion for New Trial because the jury rejected the Cenals' theory of the case and appropriately found there was no negligence based upon substantial evidence that supported Dr. Ragunton's theory of the case.

On February 27, 2003, the Cenals filed "Plaintiffs' Reply Memorandum to Defendant Luis Ragunton, M.D.'s Opposition to Plaintiffs' Motion for New Trial Filed on February 11, 2003, Filed on February 24, 2003." The Cenals maintained the jury had ignored the circuit court's instructions and incorrectly responded to the Special Verdict form.

On April 1, 2003, the circuit court filed an "Order Denying Plaintiffs' Motion for New Trial Filed February 11, 2003" (Order Denying New Trial). The circuit court found "that there were two conflicting, mutually exclusive medical theories for the jury's consideration when deliberating on the issue of standard of care in the above-captioned case and that the jury's verdict on the issue of standard of care was not against the manifest weight of the evidence."

On April 10, 2003, the Cenals filed their notice of appeal from the February 3, 2003 Judgment and the April 1, 2003 Order Denying New Trial.

## II.

### A. Liability Insurance

The Cenals contend the circuit court erred in refusing to allow the Cenals to ask prospective jurors if the jurors had an interest in or relationship to MIEC (Dr. Ragunton's insurance company). The Cenals also contend the circuit court erred in refusing to allow the Cenals to cross-examine Dr. Druger with regard to his prior financial relationships with MIEC. Both of these contentions are grounded in the granting of Dr. Ragunton's Motion in Limine by the circuit court.

The Motion in Limine was based on HRE Rules 403 and 411. Rule 403 provides:

**Rule 403 Exclusion of relevant evidence on grounds of prejudice, confu-**

---

4. It appears either one jury member abstained from voting on question 1 or the foreperson made a mistake in writing the numbers.

5. The jury was instructed to skip question 2 if the answer to question 1 was "No," to skip question 4 if the answer to question 3 was "No," and to skip question 5 if the answers to questions 1 and 3 were "No."

sion, or waste of time. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Rule 411 provides:

**Rule 411 Liability insurance.** Evidence that a person was or was not insured against liability is not admissible upon the issue whether the person acted negligently or otherwise wrongfully. This rule does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proof of agency, ownership, or control, or bias or prejudice of a witness.

### 1. Jury Voir Dire

■ The Cenals contend the circuit court erred in granting the Motion in Limine because the Cenals were then precluded from questioning the prospective jurors about any juror's relationship with or connection to MIEC. The Cenals assert they were forced to try their case "blindly as to any potential hidden motive, bias or interest of members of the juror panel, including jurors either employed by or with relatives in the health care field or in insurance." As a result, the Cenals contend their fundamental right to a fair trial was curtailed.

■ "Whether there has been a denial of the right to a fair and impartial jury is an issue of law. Issues of law are reviewed under the right/wrong standard." *Barcai v. Betwee*, 98 Hawai'i 470, 475, 50 P.3d 946, 951 (2002). Both the Cenals and Dr. Ragunton cite to *Barcai* as supporting their respective positions on the limitation of voir dire.

In *Barcai*, the plaintiffs argued that their right to a fair and impartial jury was substantially impaired and contended that under *Carr v. Kinney*, 41 Haw. 166 (1955), they did not need to demonstrate what prejudice resulted from the trial court's action. *Barcai*, 98 Hawai'i at 476, 50 P.3d at 952. The Hawai'i Supreme Court narrowed the broad language of *Carr*, concluding *Carr* did not

stand for plaintiffs' proposition. *Id.* The court explained:

In *Carr*, the plaintiff, in a personal injury suit, was prohibited from asking potential jurors during jury selection any questions relative to their interests in two insurance companies that insured the defendant or any questions involving insurance in any form. This court held that the restriction on the plaintiff constituted reversible error. However, the primary focus of the analysis was upon the defendant's contention that, if the suggestion was raised that a defendant was insured, then jurors would not be able to impartially judge the case and would be inclined to decide too easily in favor of the plaintiff or award the plaintiff a larger amount in damages than they otherwise would.

*Barcai*, 98 Hawai'i at 476, 50 P.3d at 952 (internal quotation marks and citations omitted). The court further stated:

Significantly, this court noted the distinct possibility that individual members of the jury panel could have had a financial interest in one of [the] companies that insured the defendant, given the fact that the company was *owned in large part by one of Hawai'i's largest employers.* Moreover, the court noted that, in fact, *two of the employees of this corporation holding stock in the insurance company were listed on the jury panel.*

. . . .

. . . It is clear, therefore, that the court's decision in *Carr* rested upon its perception that there existed a significant likelihood of prejudice to the plaintiff as a result of her inability to ask questions concerning the financial interests of potential jurors in the companies that insured the defendant.

*Barcai*, 98 Hawai'i at 476–77, 50 P.3d at 952–53 (internal quotation marks, citations, and brackets in original omitted; emphases and bracketed material added).

At the hearing on the Motion in Limine, the following exchange occurred among counsel and the circuit court:

[Cenals' Counsel:] Medical Insurance Exchange in California, Your Honor, is the

largest medical malpractice insurance carrier in the state. There are only two—Hapi and MIEC, and MIEC is the largest. They have employees here, they have offices here, and they have adjusters here.

Your Honor, with all due respect, I should be allowed to simply question the jurors as to, consistent with case law, whether any of their family members or they themselves are employed by or are officers or shareholders in the insurance carrier for the defendant in this case.

. . . .

. . . I would respectfully ask the Court to allow me to maybe submit some additional authority if it would be of assistance.

THE COURT: Well, you can submit additional authority, and I'm happy to consider it. I think when you get a juror questionnaire, it includes who their employer is, it includes who their spouse's employer is.

And if someone has—if their—Crawford & Company is one of their employers or some other adjuster or anything else, you can go in and ask them, What do you do there? You ask them whatever.

. . . .

[Cenals' Counsel]: The problem, Your Honor, is this: I will not be able to know for purposes of having an impartial non-biased or not interested jury—I will not be able to know whether there is a time bomb sitting on that jury because one of those jurors has a close relationship to the insurance company either defending this doctor or another physician.

And if for some reason the questionnaire is a spouse—let's say their spouse is employed by or their spouse has shares in or some interest in a carrier for either the defendant or some other insurance company, I won't know that. I won't know that that juror—I have no chance in this trial because I have a juror on that panel who has an interest.

. . . .

[Dr. Ragunton's Counsel]: If I could just briefly.

. . . [O]ur Supreme Court rendered the decision of *Barcai v. Betwee* . . . . And in

that case the Court ruled that a party can ask potential jurors about whether any potential juror might have a financial interest—financial interest in the company, the insurance company, that may be insuring a party to the case.

Now, in this kind of situation that we're dealing with here, MIEC is a physician-owned company; therefore, you will not have any non-physician potential juror having any financial interest in the case, number one.

Number two, [the Cenals] brought up the fact that, well, [MIEC] have employees in Hawai'i. That is true. They do have at the present time one, two, three—four employees. Now, if any of those employees happen to end up in the jury pool, they're out. I would tell them, You leave. I would tell the Court; I would tell them. If any of their immediate family or relatives get into the box, I'm going to know it; and I'm going to tell the Court, Let them go. We don't want them in here.

But that's how you deal with this kind of situation where the company is a company like MIEC. If we're talking about Allstate, State Farm, that's a different situation. . . . But that's not the kind of situation we have here.

. . . .

[Cenals' Counsel]: Your Honor, if I may.

Counsel has cited [a] case. . . . I request I be allowed to submit a copy of the case where the Supreme Court is saying that counsel has a right to ask the jury whether they have a financial interest or stake in the insurance carrier. This is yet another case that directly holds that I have that right.

. . . .

THE COURT: Well, financial interest goes to, you know, are you a stockholder or whatever.

[Cenals' Counsel]: Correct. And that's all I'll ask the jury.

THE COURT: His comment is it's physician owned.

[Cenals' Counsel]: It's physician owned, but do we have a spouse on the jury who may have an interest in the company? Do

we have a relative on the jury who may have an interest in the company, a financial interest? I don't know what the shareholder situation is. I don't know how the company is held in terms of—

THE COURT: Then you ask questions: Is anybody related to a doctor? Is anybody—you know, those things. There's other ways to do it without raising the issue of insurance.

Unlike the insurance company in *Carr*, MIEC is not a large employer or owned by a large employer in the state. Even though MIEC may be the largest medical malpractice carrier in Hawai'i, it has few employees within the state. MIEC is a physician-owned company; therefore, the only potential jurors who would have a *financial interest* would be physicians and their immediate relatives. As the circuit court pointed out, the juror questionnaires would indicate each juror's employer and his/her spouse's employer. The circuit court also instructed counsel on what questions to ask to find out about potential MIEC financial interests of jurors. There was no evidence presented that jurors on the panel were MIEC employees or others with a financial interest in MIEC. Therefore, unlike the situation in *Carr*, there was not a substantial likelihood of prejudice to the Cenals by being limited on the scope of their voir dire. We conclude the circuit court did not err by precluding the Cenals from referencing liability insurance in their voir dire of the jury.

### 2. Cross–Examination of Dr. Druger

■ The Cenals assert Dr. Druger has potentially been paid as much as $25,000.00 by MIEC. They argue they should have been allowed to cross-examine Dr. Druger with respect to his interest or motive in testifying on behalf of MIEC under HRE Rule 609.1.

Hawai'i Rules of Evidence (HRE) Rule 609.1 is pertinent and provides, in part:

Evidence of bias, interest, or motive.

(a) General Rule. The credibility of a witness may be attacked by evidence of bias, interest, or motive.

(b) Extrinsic evidence of bias, interest, or motive. Extrinsic evidence of a witness' bias, interest, or motive is not ad-

missible unless, on cross-examination, the matter is brought to the attention of the witness and the witness is afforded an opportunity to explain or deny the matter.

However, under HRE Rule 403, although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. As a result, admission of evidence of bias, interest, or motive rests in the discretion of the trial court exercised with due regard for HRE Rule 403. Thus, when faced with what purports to be impeaching evidence, a trial court must determine whether its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. A trial court's decision to exclude impeaching evidence will not be reversed absent a showing of abuse.

*Coyle v. Compton*, 85 Hawai'i 197, 210, 940 P.2d 404, 417 (App.1997) (internal quotation marks, citations, and brackets omitted). An abuse of discretion occurs if the trial court has "clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 114, 839 P.2d 10, 26 (1992).

Although not cited by the Cenals, HRE Rule 411 also provides in relevant part: "This rule *does not require the exclusion* of evidence of insurance against liability when offered for another purpose, such as ... bias or prejudice of a witness." (Emphasis added.)

There is no case law in Hawai'i construing the language found in HRE Rule 411 concerning evidence of liability insurance offered for the purpose of showing bias or prejudice of a witness. The Commentary to HRE Rule 411 states, in relevant part:

The virtual unanimity of judicial rejection of evidence that a party is or is not insured against liability is soundly based on both legal and policy considerations. *Foremost among these is the question of relevance.* The fact that a party to an action does or does not carry liability insurance provides no logical basis for an inference of negligence or lack of negligence. *Of equal concern* is the danger that knowledge of the existence or the lack of liability insurance coverage *might bias the jurors, and influence them* to make a decision on irrelevant and improper grounds.

(Emphasis added.) It appears from the Commentary that judicial rejection of insurance evidence addresses dual concerns of relevance and prejudice.

Other states that have examined the admissibility of liability insurance evidence have balanced the relevancy of such evidence with its probative value and prejudicial effect. In particular, the Iowa Supreme Court in *Strain v. Heinssen*, 434 N.W.2d 640 (Iowa 1989), addressed the issue of cross-examining expert witnesses hired by liability insurance carriers. In *Strain*, the supreme court was faced with the following situation:

Strain moved for a ruling in advance of trial concerning the scope of her counsel's cross-examination of Dr. Heinssen's expert witnesses, physicians Farb and Elston. Specifically, Strain sought to show that Dr. Farb and Dr. Elston were both hired, not by the defendant, but by his malpractice liability carrier[.]

Only through this testimony, Strain claimed, could she reveal the bias of these witnesses as "hired guns" for Dr. Heinssen's insurance carrier. The trial court disagreed. It ruled that Strain's counsel could cross-examine the doctors generally concerning the frequency with which they had previously testified on behalf of doctors in other malpractice cases, including

whether that testimony supported the plaintiff or the defense, but could not inquire concerning the experts' employment by a named insurance company[.]

434 N.W.2d at 641.

Strain appealed, and the Iowa Court of Appeals ruled that Iowa Rule of Evidence 411 [6] expressly authorized the introduction of evidence that an expert witness was hired by a liability insurance company and that, under *Charter v. Chleborad*, 551 F.2d 246 (8th Cir. 1977),[7] the trial court's action compelled a reversal. *Strain*, 434 N.W.2d at 642. The Iowa Supreme Court disagreed, stating "we are convinced that both rule 411 and the *Charter* decision leave a good deal of room for trial court discretion in such evidentiary matters[.]" *Strain*, 434 N.W.2d at 642.

In analyzing the issue at hand, the Iowa Supreme Court noted that "evidence of insurance is rarely probative and frequently prejudicial." *Id.* The court further noted that "[n]evertheless, under both rule 411 and the common law, insurance coverage may be revealed to show evidence of bias or prejudice, particularly where used to impeach a witness who is an employee or agent of the insurer." *Strain*, 434 N.W.2d at 642.

The Iowa Supreme Court distinguished *Strain* from cases (including *Charter*) in other jurisdictions, emphasizing the differences in the nature of the witness's relationship (i.e., attorney, employee, or agent) with the insurance company. *Strain*, 434 N.W.2d at 642–43. The court pointed out:

The record before us discloses no evidence that the relationship between Farb, Elston, and St. Paul is closer than that of any other experts and the insurer calling them in a malpractice case. Beyond mere payment in exchange for testimony in this trial (*and in Dr. Farb's case, a handful of other trials*), *no agency or employment relationship was established.*

---

6. Iowa Rules of Evidence Rule 411 uses the same language as Federal Rule of Evidence Rule 411 and Hawaii Rules of Evidence Rule 411, except the federal and Hawai'i rules are gender-neutral.

7. In *Charter v. Chleborad*, 551 F.2d 246 (8th Cir.1977), the character witness for the defense, who was to testify as to the veracity of the

plaintiff's expert witness, was employed as an attorney for the defendant's insurance company. The Eighth Circuit Court of Appeals held that evidence that the character witness was employed by the defendant's insurance company was clearly admissible to show possible bias of that witness. *Id.* at 248.

*Id.* at 643 (emphasis added). The court also noted:

> Here the trial court allowed Strain wide latitude to question the defense witnesses about whether they were paid to testify and the frequency with which they testify for doctors in malpractice cases. It was obvious on whose behalf they were testifying. On this issue of "disinterestedness," we think the relevant evidence is not *who* paid for their testimony but the fact it was procured through a promise of compensation by the defense.

*Id.* (emphasis in original). The Iowa Supreme Court held that the trial court had reasonably balanced the questions of relevancy, probative value, and prejudice. *Id.* The court concluded by saying:

> In summary, we reject the suggestion implicit in the court of appeals decision that would have us require the revelation of insurance in all cases where an insurance company has paid an expert for testimony. *We are convinced such an expansion of the exception to rule 411 would swallow up the rule itself.*

*Id.* (emphasis in original omitted; above emphasis added).

At the Motion in Limine hearing, Dr. Ragunton's counsel explained Dr. Ragunton's prejudice concerns about evidence of and reference to MIEC during trial:

> [Dr. Ragunton's Counsel:] So what happens if you allow [the Cenals] to bring up the name of an insurance company? Just by doing that, they—they give attention to the fact that there is an insurance company involved in the case anyway.
>
> I mean, let's face it. People are not stupid. They know that there's insurance there, but we—the whole purpose of this is to try to downplay and not raise this to the attention of the jury. By them bringing up matters about MIEC or insurance company, I think that goes against what we're trying to do here. And I think the Court's inclination is the right inclination. There shouldn't be any reference to insurance in this case. It's the claim of the patient against the doctor.
>
> And so I just want to make—just get one clarification, Judge. If you are still inclined to go the way you had indicated, that would be that they cannot bring up any questions regarding the insurance company in this case, right?
>
> THE COURT: Right.
>
> [Dr. Ragunton's Counsel]: The reason why I ask that is I was just reading the deposition of one of the—my experts. And the big question that [Cenals' Counsel] kept asking right at the beginning of the depo was, How many cases have you done for MIEC?
>
> Now, MIEC didn't hire—didn't hire my expert; I did. But they kept asking it, and obviously, you know, the expenses that are incurred by hiring experts are paid on behalf of the doctor by the insurance. Everybody knows that. We all know that. But that's the kind of thing we don't want to get into during trial.

The following discussion ensued between Cenals' counsel and the circuit court about who was paying Dr. Druger's fees and the relevance of that information:

> [Cenals' Counsel:] Counsel says he hires the doctor, but MIEC pays him and he's been paid by MIEC. I asked him in his deposition, How much over the past—I can't recall the number of years. But he would say, It could be 25,000, it could be more. He didn't think so but it could have been even more than $25,000.
>
> The fact that MIEC is the largest insurer in the State of Hawai'i and has repeatedly hired—or paid this physician—as Thomas Jefferson said, He who controls your purse strings controls your loyalty. And I think I have a right under—602.1 [correct rule is HRE Rule 609.1] I believe is the rule on impeachment of witnesses to inquire into his bias, interest, or motive.
>
> . . . And I think I should have a right to inquire of this witness about the service that pays him, the insurance company that sends him that check, Medical Insurance Exchange of California, over the past ten years.
>
> THE COURT: See, I think you can get into the same information without going into who signs off on the check.
>
> . . . .

As I had mentioned, you can say, How often have you testified for defendants, or, How often have you testified on behalf of doctors? What amount of income have you earned because of that? What percentage of your income is that?

You can do all that without getting into who wrote the check.

[Cenals' Counsel]: Well, my—

THE COURT: That's fair game.

[Cenals' Counsel]: Sure.

THE COURT: That's completely fair game.

[Cenals' Counsel]: And my only point, Your Honor, the fact that he's paid repeatedly by the same carrier I think is relevant to his interest or bias to testify favorably where he is being paid by the same insurer for that same carrier because he will continually be hired by that carrier. He has a steady stream of income. As long as he doesn't testify against any physician employed or insured by MIEC, he has an opportunity to continually testify.

And MIEC does this quite frequently, Your Honor. They hire the same experts, and no one gets the chance to challenge them about I think a significant area of interest and bias that that witness has based on the fact that they're repeatedly paid by the same carrier.

Like the trial court in *Strain,* the circuit court was faced with the question of whether to allow Cenals' counsel to cross-examine Dr. Druger on payments made to him by MIEC. Similarly, it appears from the transcript that Cenals' counsel wanted to reveal Dr. Druger's bias as a "hired gun" for MIEC. As in *Strain,* the circuit court allowed the Cenals wide latitude to explore any potential bias through questioning that would not mention insurance. In fact, the circuit court suggested questions the Cenals could ask to elicit this information.

Furthermore, at trial, Dr. Ragunton's counsel elicited the following information from Dr. Druger on direct examination:

Q. [Dr. Ragunton's Counsel] Doctor ... *you were hired by myself* to review this case and to evaluate it and give me your opinions with regard to the care and treatment rendered by Dr. Ragunton to Mrs. Cenal; is it true?

A. [Dr. Druger] *That's correct.*

Q. And, of course, *you're being paid for your time?*

A. *That's correct.*

Q. And how much are you charging today to testify in court?

A. I'm not positive, but I think it's $500 an hour.

Q. All right. And how much time have you spent reviewing this case and reviewing records and looking at depositions in terms of coming to your opinions and conclusions.

A. An estimate would probably be twenty hours.

Q. Now, *you've testified as an expert witness in other legal matters in the past.*

A. *That's correct.*

Q. *Some of them involve medical/legal cases like we have here today?*

A. *Yes.*

Q. *And have you testified as an expert witness in other capacities?*

A. *Yes.*

Q. Can you tell us a little bit about that.

A. Yes. I work with a lot of mostly men who have worked at the Pearl Harbor Naval Shipyard and have been exposed to asbestos. I have literally hundreds of patients who have abestosis and asbestos-related disease, and I've testified hundreds of times on their behalf because they have asbestosis.

Q. How many times have you been qualified as an expert by a court of law in your field of specialty, pulmonary medicine, internal medicine?

A. I would say hundreds of times.

(Emphasis added.) During closing argument, Cenals' counsel also alluded to the fact that Dr. Druger was a paid expert, stating:

More importantly, we showed you that all of [Anatalia's] treating doctors agree. These are not paid experts.

Think about how many times Dr. Druger, making 500 bucks an hour, has testi-

fied. He told you it was in the hundreds, in the hundreds. So you think about whether you can rely on that man who misled you about literature he brought to his deposition that he marked. That man who's making 500 bucks an hour and has testified hundreds of times and he knows. He knows.

It is apparent that the relevant evidence of Dr. Druger's potential bias was elicited at trial. Following *Strain*, we conclude the circuit court properly balanced the prejudice concerns of Dr. Ragunton with the relevance and probative value of liability insurance evidence to reveal Dr. Druger's potential bias. Under *Coyle*, we conclude the circuit court did not abuse its discretion in limiting evidence of bias, interest or motive with due regard for HRE Rule 403.

## B. Jury Verdict

The Cenals contend the jury misunderstood the charge. They assert that the circuit court "gave a jury instruction on the effect of admissions which the jury was required to follow, but did not do so." The Cenals surmise that "[t]he jury could have been confused on the effect of an admission due to counsel for Dr. Ragunton arguing that the admission did not matter since [Anatalia's] asthma attacks requiring steroids were not caused by allergies, but by colds/infections, which was a causation argument." The Cenals argue:

> If we take the facts from [Dr. Ragunton's] admissions response, take the opinion on standard of care from [Dr. Ragunton's] expert, and applying the law set forth [sic] in instruction 14.2 [jury instruction on standard of care], we are led to the inescapable conclusion that the jury was *required* to answer question no. 1 [regarding Dr. Ragunton's negligence] with a "Yes." They did not. The jury simply disregarded the applicable jury instructions.

(Emphasis added.)

In *Miyamoto v. Lum*, 104 Hawai'i 1, 84 P.3d 509 (2004), the Hawai'i Supreme Court stated:

> This court is extremely reluctant to reverse a trial judge's assessment of the evidence. A trial court's conclusion that a verdict is not against the weight of the evidence is sustained unless we are of the opinion that the undisputed evidence results in a verdict that is without legal support such that justice requires a new trial.

*Id.* at 11, 84 P.3d at 519 (internal quotation marks, citations, and brackets omitted). "Thus, in the proper case we have both the power and the duty to order a new trial either where the evidence is insufficient to support a verdict or where a verdict is clearly against the manifest weight of the evidence." *Petersen v. City and County of Honolulu*, 53 Haw. 440, 442, 496 P.2d 4, 7 (1972).

> [A]lthough Hawai'i courts have not expressly defined the term . "manifest weight," it appears to be a demanding standard ... premised upon the weight of the evidence:

> A ... court may set aside a jury verdict when it appears to be so manifestly against the weight of the evidence as to indicate bias, prejudice, passion, or misunderstanding of the charge on the part of the jury; or for any legal cause. But it must be remembered that respect for the jury's assessment of the evidence is constitutionally mandated.

*Stallworth v. Boren*, 99 Hawai'i 287, 305, 54 P.3d 923, 941 (App.2002) (internal quotation marks, citations, and ellipses in original omitted; above ellipses added; block quote format changed).

In the instant case, the instruction on admissions given to the jury was as follows:

> A party to a lawsuit is entitled to ask any other party to admit that certain facts are true. Plaintiff made such requests to Defendant Dr. Ragunton, and Defendant Dr. Ragunton responded to Plaintiff's requests. Dr. Ragunton has admitted the facts that were read to you during trial are true. Because these facts have been admitted, they are deemed to have been conclusively proved and you are to regard them as true.

The instruction on breach of standard of care (jury instruction 14.2) given to the jury was as follows:

It is the duty of a physician to have the knowledge and skill ordinarily possessed, and to exercise the care and skill ordinarily used, by a physician practicing in the same field under similar circumstances.

A failure to perform any one of these duties is a breach of the standard of care.

Prior to trial, Anatalia served on Dr. Ragunton requests for admissions, which he answered. At trial, the Cenals called Dr. Ragunton as a witness. Cenals' counsel questioned Dr. Ragunton about one of his answers to the admissions. Dr. Ragunton testified that he had answered "Denied" to Anatalia's request that he "admit that Dr. Luis Ragunton knew that Anatalia Cenal suffered from allergies." Prior to Dr. Ragunton's testimony regarding his answer, the following exchanges occurred:

Q. [Cenals' Counsel] Okay. Now, when you first had the opportunity to treat Mrs. Cenal, and this is back at the Fronk Clinic, you made the diagnosis of hypertension and asthma; is that right?

A. [Dr. Ragunton] Yes.

Q. And you think that, when you diagnosed Mrs. Cenal—this is while you're at the Fronk Clinic—that you would have looked back at her medical records at the Fronk Clinic by that time; is that correct?

A. Yes.

Q. Okay. So—so at the Fronk Clinic, she had a medical chart of various records in her chart that were available to you while you were at the Fronk Clinic?

A. Yes.

Q. Okay. And included in that chart was the treatment provided by Dr. Chu, allergist to Mrs. Cenal; right?

A. That is true.

Q. Okay. And you think you would have seen that or looked into that before you went into private practice and left the Fronk Clinic?

A. I looked at it; but after I left, I did not have them.

. . . .

Q. Now, you were aware that Dr. Chu, while at the Fronk Clinic, had been working up Mrs. Cenal for allergies; is that correct?

A. I know that she had been seeing him, but I wasn't aware that she had a work-up when I left. We—

Q. So you did not know that she—Dr. Chu had been working her up for allergies?

A. *I knew that he—when he had sent the patient to me, he had seen her for allergies the first time I saw her.*

Q. *Okay. But did you know that Dr. Chu—all right. So you knew that Dr. Chu had been seeing her for allergies.*

A. *That's correct.*

Q. Did you know that Dr. Chu had been working her up for allergies?

A. Yes.

\* \* \*

Q. [Cenals' Counsel] Okay. And what is allergic rhinitis?

A. [Dr. Ragunton] Allergic rhinitis is a general term. A lot of times when we talk about allergic rhinitis we mean runny nose from some type of allergen mostly like pollen, say, house dust, grass. But there's also sometimes a runny nose that can be caused by irritants such as smoke, change in weather, humidity. So there's—there's two types of runny nose. Allergic rhinitis, in general, is from an allergen like a pollen, house dust, mold.

Q. Okay. And Mrs. Cenal had been diagnosed with allergic rhinitis before you took over her care; correct?

A. That is correct.

Q. *And is it not correct that you yourself, you yourself, also diagnosed Mrs. Cenal while she was at the Fronk Clinic early on with allergic rhinitis?*

A. *Yes, I did.*

\* \* \*

Q. [Cenals' Counsel] Okay. Now, could it be, Doctor, that when you took over Anatalia Cenal's care in 1990 and when you left the Fronk Clinic, that you were un-

aware that Mrs. Cenal had suffered from allergies? Is it possible that you were not aware of that?

A. [Dr. Ragunton] I was aware that she did see Dr. Chu.

Q. I understand you knew that she had seen Dr. Chu, but is it possible that, because you hadn't seen the possibilities of allergies in her chart and you didn't have her chart for nine years, is it possible that you didn't know she suffered from allergies or you forgot?

A. Now, again, when I—when I treated her as a patient, you know, her—her symptoms were not of allergy.

Q. You admit Anatalia Cenal suffers from allergies; right?

A. I feel that, upon review of these records, that she suffered mild allergies.

Q. *Because you yourself diagnosed her with allergic rhinitis?*

A. *Yes.*

Q. *Okay. In fact, you did so on a couple of occasions?*

A. *In her treatment for allergies were really just simple medications.*

Q. *Antihistamines?*

A. *Antihistamines; and if you look at her records, her asthma was not acting up at the time her allergies—many times, her allergies were just there, not with the asthma.*

Q. And I showed you the record—

A. Uh-huh.

Q. —where her symptoms of rhinitis and wheezing had been under control with the Tavist and the Proventil; right?

A. Right; at that point in time.

Q. At that point in time?

A. Yeah.

Q. Now, you admit that Anatalia Cenal suffers from allergies; correct?

A. Yes.

Q. Okay. And the question I—I want to ask you, Doctor, is why is it, when I asked you those admissions—remember those admissions, you know, to admit certain things—

A. Uh-huh.

Q. —so we can kind of move it along?

A. Uh-huh.

Q. *Why is it that, when I asked you on those admissions to admit that Anatalia Cenal suffers from allergies, you denied that?*

A. *She—it is .in the context of if her allergies were aggravating her asthma all the time.*

(Emphasis added.)

From the preceding passages, it is evident that Dr. Ragunton's response to Anatalia's request for admissions was in the context of whether allergies were the source of her asthma exacerbations. Dr. Ragunton, in his answering brief, further addressed the distinction, stating "(1) **he clearly knew [Anatalia]** **'*had* allergies,'** but (2) **he did not believe she *suffered* from allergies *in the context of her allergies aggravating her asthma all the time*** (i.e., not 'allergy asthma')." (Emphasis in original.) Although the Cenals disparage this distinction in their reply brief, Dr. Ragunton's admission is preposterous without the distinction. As seen in Dr. Ragunton's direct examination by the Cenals, Dr. Ragunton had diagnosed Anatalia with allergic rhinitis while at Fronk Clinic, treated her allergic rhinitis with antihistamines, and knew Dr. Chu had seen Anatalia for allergies.

With this distinction in mind, we analyze the Cenals' argument that Dr. Ragunton's admission, combined with Dr. Druger's standard of care and the standard of care jury instruction, required the jury to answer yes to the negligence question. The Cenals contend Dr. Druger admitted that Dr. Ragunton breached the standard of care because of Dr. Ragunton's failure to know Anatalia suffered from allergies, to know Anatalia had tested positive on allergy tests, to review Anatalia's medical chart, and to warn Anatalia to avoid non-steroidal anti-inflammatories (NSAIs).

### 1. Dr. Ragunton's Failure to Know Anatalia Suffered From Allergies

■ During Dr. Druger's cross-examination by the Cenals, the following exchange occurred:

Q. [Cenals' Counsel] And would you agree with me that any physician conforming to the standard of care in Dr. Ragunton's position would know that [Anatalia] had allergies?

A. [Dr. Druger] Yes.

Q. And would you agree that if Dr. Ragunton did not know that [Anatalia] had allergies, that that would be below the standard of care?

A. Yes.

The Cenals contend Dr. Druger's statements show that Dr. Ragunton breached the standard of care. However, as noted previously, there was evidence presented that Dr. Ragunton did know Anatalia had allergies and that Dr. Ragunton's admission was in the context of her asthma exacerbations. Therefore, this argument fails to show the jury's verdict was against the manifest weight of the evidence.

**2. Dr. Ragunton's Failure to Know That Anatalia Tested Positive on Allergy Tests/Failure to Review Anatalia's Medical Chart**

The Cenals point to the following passages to demonstrate breaches of the standard of care by Dr. Ragunton:

A. [Dr. Druger] Sir, I don't know if he knew in 1988 whether she had allergies. I have no way of knowing that.

Q. [Cenals' Counsel] You just—

A. Can I finish.

Q. You just said—

THE COURT: One at a time.

[Dr. Druger]: She did see an allergist in 1985 at the same place where he was working. I assume that he had the records in front of him and that he knew that she saw Dr. Chu who's an allergist. Now, whether he saw those records or not, I have no way of knowing. I can't tell.

[Cenals' Counsel]:

Q. But didn't you just testify three minutes ago that the standard of care would have required him to know this?

A. It would have required him to know this and look at the records that he had in front of him when he was seeing her, yes. But I have no way of knowing if he did.

Q. No, no, no, no, no, no, no. That's the point. I know you didn't know. That's why I asked you the question that way. The point is that you just told us that the standard of care required him to know, right?

A. The standard of care would be if he's taking care of the patient, he should know her medical history, yes.

Q. Including allergies.

A. Including allergies, yes.

Q. And so if has [sic] conclusively admitted that he didn't know, he's breached the standard of care, right?

A. Yes.

* * *

Q. [Cenals' Counsel] Now, in [Anatalia's] medical records before Dr. Ragunton, there were even IGE and RASP tests which determined her allergies, correct? That she was a person who would be allergic.

A. [Dr. Druger] Yes.

Q. And it would be Dr. Ragunton's responsibility to elicit that information from his patient, wouldn't it?

A. Well, from the medical records, correct.

The Cenals contend Dr. Ragunton breached these standards of care. As previously noted, Dr. Ragunton testified at trial that he had diagnosed Anatalia with allergic rhinitis and looked at Anatalia's medical chart (which included Dr. Chu's treatment) when he worked at Fronk Clinic. He also testified that he knew Anatalia had been seeing Dr. Chu for allergies. These arguments fail to show the jury verdict was against the manifest weight of the evidence.

**3. Dr. Ragunton's Failure to Warn/Advise Anatalia to Avoid NSAIs**

The Cenals argue the following passage established that Dr. Ragunton breached the standard of care:

Q. [Cenals' Counsel] So [Anatalia] has told us that she was never advised by Dr. Ragunton to avoid any of these other

drugs, specifically including ibuprofen or aspirin. So now I would like you to tell the jury, given the fact that that's the evidence in the case, whether Dr. Ragunton complied with the standard of care or whether he breached the standard of care on that point?

A. [Dr. Druger] I mean I don't personally know if he did tell her or not; but if he didn't tell her, that would be below the standard of care.

This court, quoting the United States Supreme Court, noted in *Stallworth v. Boren, supra*:

The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. *It is the jury, not the court, which is the fact-finding body.* It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. *The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable. That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored.* Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.

99 Hawai'i at 306, 54 P.3d at 942 (brackets omitted; emphasis added) (quoting *Tennant*

8. The transcript of this portion of Anatalia's testimony is not before this court. The Cenals' opening brief does not comply with Hawai'i Rules of Appellate Procedure (HRAP) Rule 10(b) because the Cenals failed to order the necessary transcript and Rule 28(b)(7) because the Cenals do not include the "citation[ ] to the ... part[ ] of the record relied on." Cenals' counsel is warned that future non-compliance with HRAP Rules 10 and 28 may result in sanctions against him.

9. This "argument" is found in the "Concise Statement of the Case," but not in the "Legal Argument" section of the Cenals' Opening Brief. HRAP Rule 28(b) states in relevant part:
  **(b) Opening Brief.** ... [T]he appellant shall file an opening brief, containing the following sections in the order here indicated:

*v. Peoria & P.U. Ry. Co.*, 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520 (1944)).

The Cenals contend Anatalia testified at trial that she was never advised to avoid NSAIs.[8] However, Dr. Ragunton's Exhibit E, entered into evidence, shows that Dr. Ragunton noted in his medical records, "[s]he will stay away from all non steroidal medications including aspirin. Use only Tylenol for pain." As it is the jury's role to determine issues of fact, this court concludes the Cenals' argument with regard to this standard of care fails to show the jury's verdict was against the manifest weight of the evidence. Based on the foregoing analysis, we conclude the jury was not required to answer "Yes" to the question of Dr. Ragunton's negligence.

## C. Motion for New Trial

■ The Cenals contend the circuit court erred in refusing to grant their Motion for New Trial. The Cenals argue the circuit court "erred in agreeing with the defense that the jury was free to disregarded [sic] Dr. Druger's testimony that Dr. Ragunton had breached the standard of care because the jury was free to determine that the breach *was not the cause* of [Anatalia's] harm."[9] (Emphasis in original.) The Cenals assert the circuit court erred because there was no conflict in expert testimony on Dr. Ragunton's negligence.

The Hawai'i Supreme Court in *Takayama v. Kaiser Found. Hosp.*, 82 Hawai'i 486, 923 P.2d 903 (1996), stated:

    . . . .
    (7) The argument, containing the contentions of the appellant on the points presented and the reasons therefor, with citations to the authorities, statutes, and parts of the record relied on. The argument may be preceded by a concise summary. *Points not argued may be deemed waived.*
(Emphasis added.) The argument found in the "Legal Argument" section regarding the Cenals' Motion for New Trial does not address how the circuit court abused its discretion. Rather, it appears the Cenals rely on the section of their brief in which they argue the jury misunderstood its charge. Counsel for the Cenals is warned again that future non-compliance with HRAP Rule 28(b) will result in sanctions against him.

Both the grant and the denial of a motion for new trial is within the trial court's discretion, and we will not reverse that decision absent a clear abuse of discretion. An abuse of discretion occurs where the trial court has clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant.

*Id.* at 495, 923 P.2d at 912 (quoting *Carr v. Strode*, 79 Hawai'i 475, 488, 904 P.2d 489, 502 (1995)).

In its Order Denying New Trial, the circuit court found "that there were two conflicting, mutually exclusive medical theories for the jury's consideration when deliberating on the issue of standard of care in [this] case and that the jury's verdict on the issue of standard of care was not against the manifest weight of the evidence." The Cenals contend Dr. Ragunton (and by implication, the circuit court) confused the concepts of causation and standard of care and contend that if the jury accepted Dr. Ragunton's theory of the case that Anatalia's exacerbations had nothing to do with allergies, then the jury would be deciding the case on the question of causation, not on standard of care. The standard of care question asked whether Dr. Ragunton was negligent in his care and treatment of Anatalia. The causation question asked whether the negligence of Dr. Ragunton was a legal cause of Anatalia's damages.

The Cenals' theory was that Dr. Ragunton failed to diagnose Anatalia's asthma exacerbations as allergy-induced, his treatment of her asthma exacerbations as infection-induced was inappropriate, and the inappropriate treatment *caused* Anatalia to have avascular necrosis. Dr. Ragunton's theory was that Anatalia's asthma exacerbations were infection-induced, the steroid treatment was appropriate for infection-induced asthma exacerbations, and the treatment provided was not enough to *cause* Anatalia's avascular necrosis. Therefore, the standard of care question would be whether the care and treatment provided by Dr. Ragunton was appropriate for her asthma exacerbations. The causation question would be whether the treatment provided by Dr. Ragunton caused Anatalia's avascular necrosis. The jury

could only reach the causation question if they believed the care and treatment provided by Dr. Ragunton breached the standard of care.

At trial, the doctors called as witnesses by both parties had differing opinions on whether Anatalia's asthma exacerbations were caused by allergies or infection.

Irene Faust, M.D., the Cenals' expert witness, testified that, with regard to Anatalia's asthma exacerbations, "[s]ome were probably viral-related. There was one that I'm sure was truly infection-related, but I believe that a great many of her exacerbations were allergy-mediated." In his testimony, Carl Lehman, M.D., who had treated Anatalia for her asthma from April 2001 to July 2002 and who had conducted allergy testing on Anatalia, agreed that Anatalia "would be diagnosed as someone with asthma with multiple precipitating factors including allergies."

During cross-examination of Chiyome Fukino, M.D. (Dr. Fukino), who treated Anatalia in 1988–1989 and again in 2000–2001, Dr. Ragunton's counsel asked Dr. Fukino about Anatalia's medical records:

Q. [Dr. Ragunton's Counsel] May 10th, 1989, do you see that on page 14?

A. [Dr. Fukino] Yes, I do.

Q. Okay. At that time, she came in and she was, basically, complaining about the fact that she was starting to wheeze at night?

A. Correct.

Q. Okay. And she complained to you about the fact that she had some yellow sputum with her cough?

A. Correct.

Q. *Okay. And your assessment at that time was that she had the flu syndrome and she had asthma; is that correct?*

A. *That's correct.*

Q. Okay. And, again, you know, asthma is the type of condition that a number of things can cause it to become exacerbating.

A. Correct.

Q. One of them—

A. Is the flu.

Q. —are infections.

A. Yeah, and the flu is one of them; correct.

Q. Yes. Colds, flu, upper respiratory infections of bronchitis, that type of thing.

A. Correct.

(Emphasis added.) On recross-examination, the following exchange occurred between Dr. Fukino and Dr. Ragunton's counsel:

Q. [Dr. Ragunton's Counsel] And below that, you have some information. Is it correct that that information below the word notes is what the patient has told you?

A. [Dr. Fukino] Yes.

Q. Okay. And so the first line there it says no asthma attacts [sic] since November of 1998; is that true?

A. That's what it says.

Q. And then it says had with upper respiratory infection symptoms?

A. Yes. What that means is that all the patient—because I'm usually writing as the patient is talking.

Q. Uh-huh.

A. Although they may feel like they didn't have an asthma attack—you know, patients with asthma live with not being able to breathe very well.

Q. I understand that.

A. Where you and I wouldn't tolerate it, they'll tolerate it. And so, to them, it's not an attack that requires that they go to the E.R. and take more medicines.

Q. Uh-huh.

A. But they will say, "Oh, yeah, it gets worse when I catch colds." And that's U.R.I. symptoms. So, in other words, even though she didn't have what she referred to as an attack—

Q. Uh-huh.

A. —she did have a worsening of her systems with colds.

Q. Yeah, she—

A. That's why I put that. Usually, like I said, I'm writing as the patient is talking.

Q. I understand that.

A. *And so that's why it has that colon and had with U.R.I. symptoms. What that tells me is that, even though she*

*doesn't think she's been having attacks—obviously, she's not breathing as well, and then she will say, "Yes. When I have a cold, it's—when I breathe, it's harder."*

Q. *Correct.*

A. *But, to me, that's an exacerbation of her asthma even if she doesn't feel that.*

Q. I understand that.

A. Yeah.

Q. *So what she's trying to tell you is that she gets these exacerbations with U.R.I.'s, upper respiratory infections?*

A. *Whatever her baseline is is aggravated by a cold.*

Q. I understand.

A. That's correct.

(Emphasis added.)

Dr. Druger testified:

From my review of the records, every time she saw Dr. Ragunton, she had what we would call an infectious process. I would say just about every single time she had mucous production, she had sputum production which is phlegm. She had an upper respiratory infection, basically a cold. Each time those were the inciting, triggering events that caused her asthma.

I saw nowhere, except maybe one time when she took Advil, where a drug or a specific allergen like a cat or grass or dust precipitated the asthma.

Additionally, Anatalia testified at trial about when her asthma would be exacerbated:

Q. [Dr. Ragunton's Counsel] Now, my understanding is that you began seeing Dr. Ragunton initially for high blood pressure, as I understand it?

A. [Anatalia] Yes.

Q. But then your asthma started acting up when you began seeing him?

A. Yes. I went in for colds and postnasal drips and stuff. And at the same time, I was wheezing I guess when he listened to me.

Q. Sure. And would it be correct, [Anatalia], that a lot of times when you did have these asthma exacerbations, that it would be at the time when you had some kind of

cold or runny nose or coughing and that type of thing?

A. More like a simple cold or, you know, those postnasal drips.

It is apparent that there were two conflicting theories as to the cause of Anatalia's asthma exacerbations, and each side presented evidence supporting their theory.

The circuit court did not err in finding that "there were two conflicting, mutually exclusive medical theories for the jury's consideration when deliberating on the issue of standard of care in [this] case and that the jury's verdict on the issue of standard of care was not against the manifest weight of the evidence." The Cenals have failed to show that the circuit court exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant. This court concludes the circuit court did not abuse its discretion in denying the Cenals' Motion for New Trial.

### III.

In light of the foregoing analysis, we affirm the Judgment filed on February 3, 2003 in the Circuit Court of the First Circuit.